**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **UAL Corporation, et al.,** | ) | **Case No. 02 B 48191** |
| | ) | **(Jointly Administered)** |
| Debtors. | ) | |
| | ) | |
| | ) | |
| **United Air Lines, Inc.,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **Adversary Proceeding No.** |
| v. | ) | **05 A 02806** |
| | ) | |
| **THE CITY OF LOS ANGELES and** | ) | |
| **LOS ANGELES WORLD AIRPORTS,** | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OF DECISION**

This adversary proceeding, arising in the Chapter 11 bankruptcy case of United Air
Lines, Inc. (referred to as "United"), was brought to enforce an asserted contractual right to
operate turboprop aircraft from the central terminal of Los Angeles International Airport
("LAX"). The defendants are the City of Los Angeles and the city department in charge of its
airports, Los Angeles World Airports (referred to collectively as "the City"), which contend
that prohibiting turboprop operations from the central terminal is an appropriate exercise of
their regulatory authority.  United also contends the City's action regarding United's turbo-
prop operations violated the automatic stay imposed by § 362(a) of the Bankruptcy Code (Title
11, U.S.C.) and is a discrimination prohibited by § 525(a) of the Code.

The proceeding is now before the court, following the reopening of evidence, on
United's motion to reconsider a judgment entered in favor of the City.  As discussed below—
and as determined originally—the evidence does not establish either a violation of the auto-
matic stay or a discrimination prohibited by § 525.  However, contrary to the original judg-
ment, the evidence does establish that under a lease with the City, United was given the right
to operate commercial aircraft, including turboprops, at one of the central terminal buildings
at LAX and that a permanent injunction is the appropriate remedy for the City's threatened
violation of this right.  Additionally, the jurisdictional basis for the entry of judgment requires
amendment.  Accordingly, United's motion for reconsideration will be granted, and a revised
judgment order entered.

## Jurisdiction

District courts have exclusive jurisdiction over bankruptcy cases, pursuant to 28 U.S.C.
§ 1334(a), and they have concurrent jurisdiction over all civil proceedings "arising under title
11, or arising in or related to cases under title 11," pursuant to 28 U.S.C. § 1334(b).  A pro-
ceeding to determine whether action by a creditor violates the automatic stay imposed by
§ 362 of the Bankruptcy Code "arises under" the Code, and so is within the district court's ju-
risdiction.  *See Wood v. Wood (In re Wood)*, 825 F.2d 90, 97 (5th Cir. 1987) ("Congress used
the phrase 'arising under title 11' to describe those proceedings that involve a cause of action
created or determined by a statutory provision of title 11."). Similarly, a proceeding to deter-
mine whether action by a creditor is a discrimination prohibited by 11 U.S.C. § 525(a) "arises
under" the Code.  Proceedings that "arise under" the Code—invoking a substantive right that
it provides—are core proceedings. *Barnet v. Stern*, 909 F.2d 973, 981 (7th Cir. 1990).

Pursuant to 28 U.S.C. § 157(a) and its own Internal Operating Procedure 15(a), the
District Court for the Northern District of Illinois has referred its bankruptcy cases to the

bankruptcy court of this district.  When presiding over a referred case, the bankruptcy court

has jurisdiction under 28 U.S.C. § 157(b)(1) to enter appropriate orders and judgments in core

proceedings within the case.  This court accordingly may enter a final judgment in this

proceeding as to United's claims arising under §§ 362 and 525.

However, an action to enforce a contract right belonging to a bankruptcy estate does

not arise under the Code; rather, it is "related to" the underlying bankruptcy case because its

outcome may affect the property that the estate has available for payment to creditors.  *In re

Xonics, Inc.*, 813 F.2d 127, 131 (7th Cir. 1987).  Contract claims of an estate that are only

within the "related-to" jurisdiction are not core proceedings.  *Home Ins. Co. v. Cooper & Coo-

per, Ltd., (In re Home Ins. Co.)*, 889 F.2d 746, 749 (7th Cir.1989)*; Sokol v. Mass. Mut. Life

Ins. Co. (In re Sokol)*, 60 B.R. 294 (Bankr. N.D.Ill. 1986).[1]  Thus, as to United's claim for

breach of contract, this court may not issue a final judgment, but rather is limited to making

proposed findings of fact and conclusions of law, subject to entry of judgment by the district

court, pursuant to 28 U.S.C. § 157(c)(1).

Both United and the City disagree with this determination.  The City argues that the

court should decline to its exercise any jurisdiction, under the doctrine of primary jurisdiction.

"Primary jurisdiction," as the Supreme Court explained in *United States v. Western Pac. R.R.

Co.*, 352 U.S. 59, 63-64 (1956), "applies where a claim is originally cognizable in the courts,

and comes into play whenever enforcement of the claim requires the resolution of issues

which, under a regulatory scheme, have been placed within the special competence of an ad-

---

[1] Indeed, as *Sokol* points out, 60 B.R. at 296-97, the core/noncore distinction was
adopted by Congress to address the Supreme Court's *Marathon* decision, which held that
bankruptcy judges, lacking life tenure under Article III of the Constitution, could not render a
final judgment in a case involving the contract claim of a bankruptcy estate.  *Northern Pipeline
Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 84 (1982) ("[T]he cases before us . . . cen-
ter upon [a] claim for damages for breach of contract and misrepresentation . . . a right created
by state law . . . independent of and antecedent to the reorganization petition that conferred
jurisdiction upon the Bankruptcy Court.")

ministrative body."   The doctrine has no application here.   United does not argue in this pro-

ceeding that the City lacks authority under applicable administrative regulations to determine

aircraft use and placement at LAX; nor does the City argue that it is required by any adminis-

trative regulation to prohibit United from operating turboprop aircraft from the central termi-

nal at LAX.   Rather, United asserts that the City contractually obligated itself to allow United

to use certain central terminal gates for whatever commercial aircraft it could properly land at

the airport, and the City denies that it undertook such a contractual obligation.   No regulation

of the Secretary of Transportation or the Federal Aviation Administration has any bearing on

this contract dispute, and the decisions cited by City—which did involve governing administra-

tive regulations—are plainly inapplicable.[2]

United, on the other hand, argues that the court has core jurisdiction over all the mat-

ters involved in its complaint, including its breach of contract claim.   First, United asserts that

the breach of contract it alleges would also violate the automatic stay, and hence that the court

may determine these "intertwined" issues together.   In granting a preliminary injunction in

favor of United and in issuing an initial judgment against United, the court accepted this ar-

gument.   However, as discussed below, even a material breach of a contract with a debtor in

bankruptcy does not, in itself, violate the automatic stay, and United has proven no additional

action by the City that would constitute such a violation.

Second, United argues that by failing to object immediately to this court's statement

regarding jurisdiction when the preliminary injunction was issued, the City implicitly con-

sented to the court's exercise of core jurisdiction.   However, well before the entry of that in-

---

[2] *In re Braniff Airways, Inc.*, 700 F.2d 935 (5th Cir. 1983), involved the allocation of "landing slots" created by FAA regulations; the question was the authority of the FAA to make the allocation and no airline contract was involved.   *Air Transp. Assoc. of America v. City of Los Angeles*, 844 F. Supp. 550 (C.D. Cal. 1994), dealt with the proper forum for pursuing a challenge to landing fees under the Anti-Head Tax Act, a federal law with an administrative enforcement mechanism that the court held excluded an implied private right of action; again, there was no claim of breach of contract.

junction, the City had answered United's complaint by stating that it "admits . . . that certain claims as alleged are core proceedings and that the Court has non-core concurrent jurisdiction over other claims asserted herein . . . ." (Adversary Docket No. 17 at ¶ 7.) Thus, the City denied, at its first opportunity, that United's entire complaint was within the court's core jurisdiction. The City took no action thereafter to indicate consent to the bankruptcy court of a final judgment on the merits of the entire complaint, and it asserted that the breach of contract claim was noncore in its post-trial brief. (Adversary Docket No. 140 at 15-17.)   Whether a party's failure to object can allow a bankruptcy court to enter judgment in a noncore matter is an unsettled question. *See In re Sheridan*, 362 F.3d 96, 100, 103 n.5 (1st Cir. 2004) (collecting conflicting authorities).  Here, however, where the City denied core jurisdiction throughout the proceeding, there is no basis for any finding of consent, express or implied.

Accordingly, the findings and conclusions set out in this decision are final only as to United's claims under §§ 362 and 525 and are proposed for the district court's consideration as to United's claim for breach of contract.

### Findings of Fact

The facilities at Los Angeles International Airport include a large central terminal area composed of nine separate terminals or "satellite buildings." Three of these terminals, designated T1 through T3, are on the north side of the central terminal area. One, the Tom Bradley International Terminal, is on the west end, and the remaining five, T4 through T8, are on the south end.  (Tr. Vol. I at 181-83; Tr. Vol. IV at 37-38; United Ex. 120; City Supp. Ex. 31.)[3]

---

[3] "Tr. Vol. I" refers to the transcript of the first day of the hearing on preliminary injunctive relief, July 27, 2006, stipulated by parties to constitute evidence in the trial on the merits of the complaint.  "Tr. Vol. II" refers to the transcript of the second day of that hearing, July 28, 2006.  "Tr. Vol. III" refers to the transcript of the additional evidence on the merits of the complaint presented on March 15, 2007, and "Tr. Vol. IV" refers to the evidence presented upon reopening, on January 11, 2008.

In addition to the central terminal area, there are three remote terminals, separate from the central terminal area. (Tr. Vol. I at 184.)

United's current operations at LAX are conducted exclusively from gates at T6, T7, and T8. ((Tr. Vol. I at 185.) However, until June 2005, United conducted substantial commuter operations, using smaller, turboprop aircraft, from a remote terminal east of the central terminal area. United's right to use its terminal space is governed by leases entered into with the City (United Ex. 1-3), and its use of non-terminal airport property (runways, taxiways, etc.) is governed by an Air Carrier Operating Permit or "ACOP" (City Ex. 8). United's lease for T8 has a term expiring on with a January 1, 2022. (United Ex. 1, § 5.)

In early 2005, United informed City officials that it intended to move its commuter operations from the remote facility to T8. On June 3, 2005, the Executive Director of LAX issued a letter (United Ex. 28) stating that this action by United would violate a 1997 policy adopted by the City's Board of Airport Commissioners, which, according to the letter, "authorized the Executive Director to prohibit commuter aircraft from operating at gates in the Central Terminal Area." The letter formally notified United that "turboprop commuter aircraft operated by or on behalf of United are prohibited from operating at gates in the Central Terminal Area." The letter went on to state that United could lose its right to operate from gates at T6 if the aircraft using those gates could be accommodated at other terminal gates to which United had access without "unreasonable operational inefficiencies." The City stated it would consider any of United's T8 gates that were being used by aircraft with fewer than 100 seats available for this accommodation. All of United's commuter aircraft have fewer than 100 seats. (Tr. Vol. I, 79.) The letter concluded with the statement that the City would be willing to consider United's proposed use of T8 for commuter operations "in exchange for United's relinquishment of its preferential gate access rights in Terminal 6."

Four days after issuing this letter, the City changed its position.  In a letter of June 7, 2005 (United Ex. 26), the Executive Director stated: "We appreciate United's attention to ensuring a safe operation of the turboprop activities for passengers and employees. As mentioned in my letter of June 3, the Board specifically authorized the Executive Director to prohibit commuter aircraft from operating at gates in the Central Terminal Area. However, the turboprop operation at Terminal 8, as you were advised yesterday morning, is formally approved. This approval is subject to revocation on six months notice."  United thereafter moved its entire commuter operation to T8, where they continue to be carried on.

On November 15, 2005, United filed a notice that it would reject the lease on the remote terminal that it had previously used for commuter operations.  (Case Docket No. 13533.) On November 22, 2005, a new Executive Director issued a letter to United stating: "Please consider this letter as Notice that the approval granted in the June 7, 2005, letter, is hereby revoked. Accordingly, United Airlines shall cease such turboprop operations in Terminal 8 on or before May 24, 2006." (United Ex. 36.)  United thereafter brought this adversary proceeding, seeking an injunction against any action by the City to prevent turboprop operations from being conducted at T8.

A temporary restraining order, prohibiting the enforcement of the ban on T8 turboprop operations, was entered by this court and continued by consent of the parties pending a hearing on a preliminary injunction, conducted on July 27 and 28, 2006.  The court entered a preliminary injunction on August 11, again prohibiting the City from enforcing its ban on United's T8 turboprop operations.

A trial on the merits of United's complaint was conducted on March 15, 2007, and on June 20, the court entered a judgment in favor of the City on all counts of the complaint. United filed a timely motion for reconsideration under Rule 9023 of the Federal Rules of

Bankruptcy Procedure.  In considering this motion, the court requested additional briefing on

several matters and reopened the evidence.

Other facts relevant to the determination of this adversary proceeding are discussed in

connection with legal conclusions set out below.

## Conclusions of Law

United's complaint in this matter is in seven counts.[4]  However, it raises only three

substantive grounds for relief.  For two of those grounds—violation of the automatic stay and

discrimination under § 525(a)—United failed to establish a right to relief, but United did es-

tablish that the City is threatening in a contractual breach as to which United is entitled to re-

lief.

A. *Breach of Contract*

1. *The language of the lease.*  Although the documents governing United's opera-

tions at LAX are complex, United's claim for breach of contract is relatively straightforward.

Under Section 23 of the lease governing its use of T8 (United Ex. 1 at 77), the City agreed that

the "rules, regulations and directives" adopted for LAX "shall provide for the preferential, but

not exclusive, assignment of gate positions and loading ramps" to United, that this assignment

of gate positions and loading ramps must "take into account [United's] needs and require-

ments" for their use, and that "gate positions and loading ramps are to be used for the loading

and unloading of aircraft in passenger service in keeping with industry practice at the Air-

port."[5]  Section 22 of the lease states that United's preferential use of gate positions and air-

---

[4] Count I seeks a declaratory judgment, and the next six counts assert claims for viola-
tion of the automatic stay, breach of contract, and discrimination prohibited by § 525(a) of the
Bankruptcy Code against the City of Los Angeles and LAWA, respectively.

[5] Section 23, in full, provides as follows:

craft loading ramps is a right that "shall vest" in United. (*Id.* at 76.)[6] And Section 30 of the lease (*id.* at 84) protects the rights granted to United from contradictory airport regulations by providing that such regulations "shall . . . not . . . contravene the rights granted to Lessee under this Lease."[7]

---

**Assignment of Gate Positions and Loading Ramps.** All assignments of gate positions and aircraft loading ramps shall be made in strict accordance with rules, regulation and directives adopted and promulgated by the Board and/or General Manager to facilitate the entry of new air carriers and to maximize the utilization of facilities at the Airport. Such rules, regulations and directives shall provide for the preferential, but not exclusive, assignment by the General Manager of gate positions and loading ramps to the Lessee of the demised premises next adjacent to each gate position and loading ramp, taking into account said Lessee's needs and requirements for the use thereof. It is further understood that the gate positions and loading ramps are to be used for the loading and unloading of aircraft in passenger service in keeping with industry practice at the Airport. To facilitate the entry of new air carriers and to maximize the utilization of facilities at the Airport, at the direction of the General Manager, Lessee agrees not to use the gate positions and loading ramps for long-term aircraft parking or aircraft maintenance purposes.

[6] Section 23, in relevant part, provides as follows:

No special possessory, exclusive or vested rights whatsoever, save and except a use in common with other airlines, and Lessee's preferential but nonexclusive use of gate positions and aircraft loading ramps adjacent to Lessee's demised premises, pursuant to Section 23, shall vest in Lessee by reason of the proximity of such demised premises to said gate positions and aircraft loading ramps.

[7] Section 30, in relevant part, provides as follows:

**Rules and Regulations**. The leasehold estate herein created shall be subject to any and all applicable rules, regulations, orders and directives governing Lessee's use and occupancy of the demised premises in effect at the commencement of this Lease or thereafter promulgated during the term hereof, laws, ordinances, statutes or orders of any governmental authority, federal, state or municipal, lawfully exercising authority over Airport or Lessee's operations hereunder, provided that the rules, regulations, orders, directives, laws, ordinances and statutes of City (including Board and General Manager) shall be reasonable and not inconsistent with or contravene the rights granted to Lessee under this Lease. Nothing herein contained, however, shall be deemed to impair Lessee's right to contest any such rules, regulations, laws, ordinances, statutes or orders or the reasonableness thereof.

United's claim is that the City, by banning United's turboprops from T8, violates

United's right to use T8 gate positions and loading ramps in preference to other carriers.[8]  The

City has responded by arguing that "gate positions" and "loading ramps" are not part of the

surface outside of the terminals, on which aircraft park during loading and unloading, and that

use of the paved surface outside the terminal is not governed by the T8 lease, but by the

ACOP.  Thus, in one of its trial briefs (Docket No. 119 at 15), the City states:

> [T]he ACOP and the Terminal Lease govern different substantive aspects of the
> relationship between LAWA and UAL, with the ACOP permitting UAL (in
> consideration of the payment of landing fees) to use the runways, taxiways,
> aprons and similar areas for aircraft landings and departures, and the Terminal
> Lease permitting UAL to use terminal assets (in consideration of rent). The
> portions of LAX governed by each instrument are entirely separate, with no
> substantial portion of the "demised premises" described in the Terminal Lease
> overlapping with the permission granted in the ACOP.

Consistent with this argument, the City presented testimony that "gate positions" and

"loading ramps" are part of the terminal building covered by the lease, rather than the paved

surface outside the terminal building.  Specifically, the City's presented the affidavit of Mi-

chael DiGirolamo, the Deputy Executive Director of Airport Operations at LAWA stating that

a "gate position" is a "hole in the terminal wall approximately 20 feet above the apron (the part

of the airfield on which airplanes sit when they load and unload passengers)" and that a "load-

ing ramp" is a "large concrete ramp[] that descended from a terminal gate position . . . down to

the apron."  (City Supp. Ex. 53 at ¶ 6.)  During a subsequent hearing, Mr. DiGirolamo ex-

panded these definitions somewhat.  His trial testimony was (1) that a "gate position" was ei-

---

[8] Preferential gate use contrasts with the other two forms of gate use employed in the
air transportation business: exclusive use and common use.  Exclusive use, as the term implies,
grants an airline complete control over the use of a gate for its flights or those of its assignees.
Common use, on the other hand, places control of the gate in the airport authorities, with no
fixed rights of any airline.  Preferential use is an intermediate form of control, in which one
airline has the right to use the gate but can be required to allow use by other airlines under
defined conditions. (Tr. Vol. I at 71-72.)  *See also* Section 2 of the lease (United Ex. 1 at 3),
defining "Preferential Use Gates" as those for which United "shall have the first right of use
during the term of this Lease" pursuant to Section 23.

ther a "numerical designation for where an aircraft is parked on the apron" or "the numerical area inside the satellite where a . . . door is to either use a ramp or a jet way" (Tr. Vol. IV at 32-33) and (2) that a "loading ramp" is any "conveyance which passengers [can use to] get from the satellite public area down to the apron," thus including stairways in addition to sloping concrete ramps (*id*. at 29).

In this way, the City argues that the preferential assignment of "gate positions" and "loading ramps" accorded by the T8 lease gives United only a right to use certain portions of the terminal building, reserving to the City—free of any limitations imposed by the lease—the right to regulate the paved surface outside the terminal building, so that a regulation limiting the types of aircraft that may load and unload on that surface could not be a breach of the lease.

The language of the lease itself, however, contradicts the City's argument, pointing instead to a definition of "gate positions and loading ramps" that necessarily includes pavement outside the terminal.

• Throughout the lease, "gate positions and loading ramps" are described as being "adjacent" to the demised premises treated by the lease. *See, e.g.,* Sections 7G (United Ex. 1 at 29), 22 (*id*. at 76), and 23 (*id*. at 77). The lease (in Section 3) defines portions of the terminal "demised" to United. (*Id*. at 3-12.) If "gate positions and loading ramps" were part of the terminal, they would not be "adjacent to" the demised premises, but part of them.

• Section 22 (*id*. at 76) of the lease deals directly with the paved surfaces of the airport outside the terminals. It states:

> City is providing as a means of access for aircraft between the Satellite [Terminal} Buildings and the taxiway and runway system of the Airport, large areas of apron pavement, gate positions and aircraft loading ramps in the area immediately adjacent to and surrounding the Satellite Buildings.

Thus, "gate positions and . . . loading ramps" are described as part of the access to taxiways and runways that "surround" the terminal buildings, not part of the buildings themselves.

• Section 23 of the lease (*id.* at 77) concludes with an agreement that United will not "use the gate positions and loading ramps for long-term aircraft parking or aircraft maintenance purposes." Obviously, aircraft cannot park on parts of the terminal building, but only on the paved surface outside the building.

• Section 24 of the lease (*id.*) provides that the City "reserves the right to regulate the use of vehicles and automotive equipment upon, over and across the apron and loading ramps around the passenger terminals." Again, this reservation only is meaningful if loading ramps are part of the pavement surrounding the terminals rather than a means of vertical movement within the terminal itself.

The ACOP itself is consistent with these lease terms. The second recital of its preamble (City Ex. 8 at 1, LA 00190) states that the permit governs "Airport landing facilities," which the ACOP defines as "common use areas of the airfield, which include the runways, taxiways, service roads, and common use ramps" (*id.* at 4, LA 00193). As discussed above (n.3), "common use" areas are distinct from those over which a carrier has been given preferential use. Thus, the ACOP distinguishes between common use ramps (paved surfaces that it regulates as part of the landing facilities) and preferential use ramps (paved surfaces that it does not regulate).

These provisions make it clear that the gate positions and loading ramps for which United is given preferential use under the T8 lease indeed include the paved surfaces adjacent to its terminal space. The lease thus requires the City to allow United to use this pavement for loading and unloading its aircraft, in preference to other carriers, taking into account United's needs and requirements, and in keeping with industry practice at the Airport. Industry practice at LAX has included substantial operation of turboprop aircraft from the central terminal

12

area (Stipulation of July 27, Tr. Vol. I at 8-9; City Ex. 27), and so the prohibition of turboprop aircraft from T8 contradicts the preferential use provision of the lease.[9]

Similarly, the City has no basis for its position that it may deprive United of gate positions and loading ramps at T6 if United does not operate aircraft with at least 100 passengers at its T8 gates.  The T6 lease covers certain space in Terminal 6 at LAX and expires on Nov. 15, 2021.  (United Ex. 2, § 4).  The lease is introduced by a set of findings (*id.* at 3) which explain that, under the lease, the City "will manage . . . four gates in Terminal No. 6, subject to United's preferential rights, and may schedule international flights of other air carriers in those gates when they are not needed for United's flights."  The lease grants United preferential use of the four specified T6 gates with conditions consistent with the findings: first priority is given to United's international flights, second priority to the international flights of other

---

[9] If there were any ambiguity on this point, it would be resolved by the parties' performance under the lease, which supports the understanding that turboprop operation in the central terminal is within the rights of an air carrier with preferential gate use.  *See Oceanside 84, Ltd. v. Fidelity Federal Bank*, 56 Cal.App.4th 1441, 1448, 66 Cal.Rptr.2d 487 (1997) (post-contract conduct of the parties can be used to construe ambiguous contractual provisions).

The most significant indication in this respect is the City's conduct in 1997.  During that year, the airport staff determined that the airport could operate more efficiently if all of the commuter aircraft then using the central terminal area were relocated to remote terminal facilities.  This conclusion followed an FAA study that recommended such a relocation to promote efficiency.  (City Ex. 9.)  The staff recommended to the Board of Airport Commissioners that it "authorize the Executive Director to initiate, develop and implement a plan to relocate commuter aircraft operations away from the Central Terminal Area" and that it "authorize the Executive Director to prohibit any additional commuter airline from operating at gates within the Central Terminal Area."  (City Ex. 11.)  By limiting the recommended prohibition to "additional commuter airlines" the staff appears to have recognized that existing commuter airline operations were not subject to forced removal from the central terminal, but could only be relocated pursuant to a voluntary plan.  As it happened, the Commissioners declined even to authorize the implementation of such a plan, requiring that it be presented to them for later approval once negotiated with the existing airlines.  (City Ex. 10, a Board resolution authorizing "the Executive Director to negotiate, but not implement a plan").  Indeed, carriers with preferential use rights were allowed to operate turboprops from the central terminal throughout 1997-2005 period, and no carrier with preferential rights was ever notified during that period that use of turboprop aircraft in the central terminal area was prohibited.  (Tr. Vol. II at 66-67, 72.)

carriers, and third priority "to domestic flights of United and other airlines . . . when the gates
are not needed for international flights." (*Id.,* § 5(b)(10) at 18-20.) The only minimum use
requirement imposed on United is that it conduct at least 8 total flights per day among the
four preferential use gates in order to retain its rights to the gates. (*Id.* at 25-29.) The entirety
of Section 5 of the lease, dealing with preferential use, can be modified only by "mutual writ-
ten agreement." (*Id.,* § 5(h) at 31.)

   2. *Reserved powers and unmistakably.* As an alternative to its argument regard-
ing interpretation of the T8 lease, the City asserts that because its prohibition on turboprop
operations was made pursuant to its regulatory authority, the "reserved powers" and "unmis-
takability" doctrines operate to bar United's claim that the City breached the lease. These
doctrines, however, do not bar United's claim.

  As a general rule, contracts involving governmental units are enforced under generally
applicable contract law. *See United States v. Winstar Corp.*, 518 U.S. 839, 895 (1996) (quoting
*Lynch v. United States*, 292 U.S. 571, 579 (1934) for the rule that "["w]hen the United States
enters into contract relations, its rights and duties therein are governed generally by the law
applicable to contracts between private individuals"); *Hall v. Wisconsin*, 103 U.S. 5, 11, 26
L.Ed. 302 (1880) ("When a State descends from the plane of its sovereignty, and contracts
with private persons, it is regarded pro hac vice as a private person itself, and is bound accord-
ingly."). Indeed, as applied to state and local governments, this principle is embodied in the
Contract Clause of the Constitution: "No state shall . . . pass any . . . Law impairing the obliga-
tion of Contracts . . . ." U.S. Const. art. I, s. 10 cl. 1.[10]

  However, the general rule of enforcement of governmental contracts is subject to limi-
tations designed to assure that a government "continues to possess authority to safeguard the

---

[10] The Contract Clause is fully applicable to municipal governments. *Catawba Indian
Tribe v. City of Rock Hill*, 501 F.3d 368, 371 n. 3 (4th Cir.2007), citing *N. Pac. Ry. Co. v. Min-
nesota*, 208 U.S. 583, 590 (1908).

vital interests of its people." *Home Building & Loan Assn. v. Blaisdell*, 290 U.S. 398, 434-35 (1934). One of these limitations, the "reserved powers' doctrine," provides that certain powers of sovereignty of a government— "essential attribute[s] of its sovereignty"—may not be contracted away and that the government cannot be compelled to adhere to a contract that purports to do so. *U.S. Trust Co* v. *New Jersey*, 431 U.S. 1, 23-24 (1977); *Matsuda v. City and County of Honolulu*, 512 F.3d 1148, 1153 (9th Cir. 2008) (identifying the police power and eminent domain as protected attributes of sovereignty) At the same time, governmental contracts that are essentially financial transactions are not subject to the reserved power doctrine. See *U.S. Trust*, 431 U.S. at 24 ("Whatever the propriety of a State's binding itself to a future course of conduct in other contexts, the power to enter into effective financial contracts cannot be questioned."). Thus, the *Matsuda* decision noted that "most contracts in which a state agrees to limit its power to act in the future will not be subject to prohibition". *Id*. Moreover, "when a state is itself a party to a contract, courts must scrutinize the state's asserted purpose with an extra measure of vigilance," *McGrath v. Rhode Island Retirement Bd.*, 88 F.3d 12, 16 (1st Cir. 1996). "The government-as-contractor cannot exercise the power of its twin, the government-as-sovereign, for the purpose of altering, modifying, obstructing, or violating the particular contracts into which it had entered with private parties." *Yankee Atomic Elec. Co. v. United States*, 112 F.3d 1569, 1575 (Fed. Cir. 1997).

A second limitation on governmental contract enforcement is the "unmistakability" doctrine, a canon of construction disfavoring implied governmental obligations in public contracts. This doctrine provides that: " 'sovereign power . . . governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms.' " *Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41, 52 (1986). Accordingly, "a contract with a sovereign government will not be read to include an unstated term exempting the other contracting party from the application of a subsequent sovereign

act, nor will an ambiguous term of a grant or contract be construed as a conveyance or surren-

der of sovereign power." *Winstar*, 518 U.S. at 878 . Again, though, this doctrine is itself lim-

ited.  The plurality opinion in *Winstar* cautioned against: "adopt[ing] any rule of construction

that would weaken the Government's capacity to do business by converting every contract it

makes into an arena for unmistakability litigation." *Id*. at 886.

The City contends both that its ban of turboprop aircraft from T8 is essential to protect

public safety and convenience and that it has not surrendered its right to regulate use of T8 in

unmistakable terms.  Neither contention is supported by the evidence.

The use of turboprops in the central terminal area of LAX was not shown to present

any significant risk to public safety.  Turboprops have safely operated from the central termi-

nal area continuously and in large numbers, since the mid-90s. Moreover, the safety of turbo-

prop operations was confirmed by the manager of LAX and the chief of its operations, with

overall responsibility for airport safety during the relevant period.  (Tr. Vol. I at 177; Vol. II at

4-5, 10, 15-18.)  It was the conclusion of the Executive Director, expressed in the letter of

June 7, 2005 (United Ex. 29).  And it is reflected in an internal staff memorandum addressing

the subject.  (United Ex. 111.)   The major evidence of a potentially unsafe operation was pro-

vided in the testimony of Michael DiGirolamo. (Tr. Vol. II at 43-44.)  However, these safety

concerns were based on observations made in 1996-97 that did not involve T8 and were made

without knowledge of safety measures employed by United.  (Tr. Vol. II at 79-80.)

The evidence indicates that, rather than being concerned with safety, the City's deci-

sion to prohibit turboprop operations from the central terminal facility was based on a desire

to increase passenger capacity at LAX.   Airport officials indicated both in writing  (United Ex.

28) and orally (Tr. Vol. I at 128-29) that they would be willing to allow United to continue to

use T8 for turboprop operations if United gave up its preferential right to terminals on T6.

But maximizing airport efficiency in connection with air carrier contracts is essentially a finan-

cial transaction.  The T8 lease itself, as reflected in its preamble (United Ex. 1 at 1-2) was negotiated in connection with "the construction of expanded passenger terminal facilities" with United undertaking the financial responsibility for the construction.[11]  The grant of preferential gate access at T8 was a necessary component of the overall transaction: United could not have been expected to agree to finance construction of a terminal without assurance that it would be able to use the terminal in the ordinary course of its business.  That the City now believes that there could be a more efficient use of the terminal does not provide a basis for allowing a regulatory rewriting of the parties' agreement under the reserved powers doctrine.[12]

The unmistakability doctrine is also inapplicable here.  Even if the T8 lease, as an essentially financial transaction, is subject to the doctrine, the lease does in fact restrict future regulation in unmistakable terms.  As discussed above, Section 23 of the lease clearly accords United preferential use of the gate positions and loading ramps needed to operate its business from T8, and Section 30 explicitly states that the "rules, regulations, orders, directives, laws,

---

[11] As reflected in other litigation in United's bankruptcy, the T8 lease was part of a complex arrangement to support over $75 million in financing for new terminal construction. *See In re UAL Corp*., 374 B.R. 625, 627-28 (Bankr. N.D.Ill.  2007).

[12] The situation here is much like the one considered by the Supreme Court in *City of Detroit v. Detroit Citizens' Street Ry. Co*., 184 U.S. 368 (1902).  That case involved a contract between the city of Detroit and street rail companies that had invested substantial sums to develop a street rail infrastructure, under the rates of fare allowed by contracts with the city. *Id*. at 369-71.  By later ordinance, the City of Detroit ordered fares reduced.  Reduced fares would presumably have resulted in greater use of the street car system.  Nevertheless, the Supreme Court struck down the ordinance, stating that where "binding agreements were made and entered into between the city on one side and the companies on the other relating to rates of fare . . . such agreements could not be altered without the consent of both sides." *Id*. at 385.  In so doing, the Court noted the financial reality underlying the companies' investment: "It would hardly be credible that capitalists about to invest money in what was then a somewhat uncertain venture, while procuring the consent of the city to lay its rails and operate its road through the streets in language which . . . gave the company a right to charge a rate then deemed essential for the financial success of the enterprise, would at the same time consent that such rate then agreed upon should be subject to change from time to time by the sole decision of the common council." *Id*. at 384.

17

ordinances and statutes of City (including Board and General Manager) shall . . . not . . . con-

travene the rights granted to Lessee under this Lease."

United, then, is entitled to enforcement of its preferential use rights as against the City's

announced ban of turboprop use at T8.

   3. *Form of relief.*  In addition to being supported by a finding that United was

likely to prevail on the merits of its contract claim, the preliminary injunction previously en-

tered in this case was grounded in findings that the balance of harms and the public interest

favored that relief.[13]  Now that United has established a breach of contract, the question of

appropriate relief is that of specific performance—whether damages would be an inadequate

remedy. *Walgreen Co. v. Sara Creek Property Co.*, 966 F.2d 273, 275 (7th Cir. 1992)

("[D]amages are the norm, so the plaintiff must show why his case is abnormal . . . [W]hen . . .

the issue is whether to grant a permanent injunction, not whether to grant a temporary one,

the burden is to show that damages are inadequate . . . .").

   United has established the inadequacy of damages.  A forced return to the remote fa-

cility would disrupt its schedules and cause a decline in convenience and comfort for passen-

gers, who would have to be bused from the central terminal area to the less pleasant remote

facility, with a 5-15 minute increase in connection time.  (Tr. Vol. I at 38-40, 56-58.)  The re-

sulting loss of goodwill would be a significant harm to United that cannot be quantified.  *See*

*American Food & Vending Corp. v. United Parcel Service Oasis Supply Corp.*, 2003 WL

---

[13] United presented surveys of customers showing that the traveling public prefers
commuter flights being operated from the central terminal by a significant measure, and that
this operation allows for shorter, more pleasant connections.  (United Ex. 77, Tr. Vol. I at 57-
58.)  Although the 1997 FAA study (City Ex. 9) indicated that overall airport operations would
be more efficient if commuter flights were operated from remote terminals, that study re-
flected a different operating environment than the one currently in place at the airport.  The
appropriateness of using the central terminal for turboprop operations at the current time is
reflected the current airport Master Plan (United Ex. 88 at 2-32 and following), which calls for
elimination of all remote terminal facilities and for all turboprop operations to be conducted
from the central terminal.

256865 at °2 (N.D.Ill. Jan 31, 2003) ("Because of the difficulty in assessing the damages asso-

ciated with a loss of company's goodwill, such damages to goodwill can constitute an inade-

quate remedy at law.")  Indeed, because of differences in location and non-quantifiable quali-

ties of real estate, contracts involving real estate are routinely subject to specific performance.

See Walgreen, 966 F.2d at 966 (noting that "[b]ecause of the absence of a fully liquid market

in real property and the frequent presence of subjective values . . . the calculation of damages

is difficult").   Thus, a permanent injunction enforcing United's preferential use rights at T8

and T6 is the appropriate relief.

United has requested damages in addition to injunctive relief, based on its continuing

to pay rent for the remote terminal that it has not been using since 2005.  United's theory is

that, but for the City's announced ban on turboprop operations at T8, United would have been

able to avoid paying this rent by rejecting the remote facility lease pursuant to § 365(a) of the

Bankruptcy Code.  The difficulty with this theory is that United has requested—and ob-

tained—enforcement of its right to preferential use at T8. Although the City threatened to

prevent turboprop operations at T8, that threat has never been carried out.  The damages

United seeks, therefore, are not a result of any breach by the City, but rather a result of

United's actions to protect itself against the denial of its request for injunctive relief.  Having

succeeded in that request, United cannot claim damages. *See BD Inns v. Pooley,* 218 Cal. App.

3d 289, 298-99, 266 Cal. Rptr. 815 (1990) (holding that a plaintiff must elect between damages

and specific performance, and if granted specific performance may only receive damages re-

sulting from a failure of the defendant to perform in the time required by the contract).  A

permanent injunction is the limit of the appropriate relief here.

B. *Discrimination under § 525(a)*

Section 525(a) of the Bankruptcy Code provides in relevant part that "a governmental unit may not . . . revoke . . . a . . . permit . . . or other similar grant to . . . a person that is or has been a debtor under this title . . . solely because such . . . debtor is or has been a debtor under this title. . . or has not paid a debt that is dischargeable . . . ." United contends that the City revoked permission to operate turboprops at T8 solely because United attempted to discharge a portion of the debt it owed for rent on the remote terminal by giving notice of termination of the lease on that terminal.   There is legal support for such a claim. For example, *In re Valentin*, 309 B.R. 715, 722 (Bankr. E.D. Pa. 2004), found a potential for discrimination prohibited by § 525(a) in a public housing authority's termination of a lease during bankruptcy based on the tenant's failure to pay prepetition rent; to avoid a finding of discrimination, the authority was required to consider the debtor for a future lease without regard to the bankruptcy filing or discharge of the debt from the prior lease.  Similarly, here, if United could show that the City terminated permission to use turboprops at T8 because United sought to avoid payment on the remote terminal lease, there would be a prohibited discrimination.

However, United presented no persuasive evidence that the City acted from such a purpose.  United cites only the short time between its notice of rejection of the remote terminal lease (November 15, 2005) and the City's revocation of turboprop access to T8 (November 22, 2005).  But the City initially determined to deny United's commuter operation at T8 in June, well before the lese rejection, while United was still paying rent under the remote terminal lease.  And, as noted above, the evidence indicates that the City's principal motivation has long been to open the central terminal area to larger aircraft, as reflected in its willingness to allow United to continue turboprop operation at T8 in exchange for surrendering preferential gate use at T6.  A desire to obtain the use of airport gates for larger aircraft is a concern

20

separate from United's bankruptcy filing or rejection of the remote facility lease and negates a finding of discrimination under § 525(a).

`      C. *The automatic stay.*

United's remaining legal claim is that by seeking to ban turboprop operations at T8, the City violated the automatic stay imposed by § 362(a).  To the extent that this claim is based on the theory that the City took action with respect to T8 in order to collect payments from United under the remote terminal lease—a violation of § 362(a)(6)—the claim fails for want of proof.  As discussed in connection with the § 525(a) claim, there is no evidence that the City took its action because of a concern regarding remote terminal rent; rather, the evidence indicates that the City asserted the authority to bar turboprops from T8 before United gave notice of rejection of the remote terminal lease and that it did so for reasons of airport utilization unconnected to the remote terminal lease.

Nor can it be argued that because United has a contractual right to operate turboprops at T8, the City violated § 362(a)(3) by denying that right so as to "exercise control" over property of United's bankruptcy estate.  Breaching a debtor's contract right does not take control of the right from the estate; the estate fully retains the right and may enforce it in an appropriate legal action.  If breach of a contract were a violation of the automatic stay, then every contract right of a debtor in bankruptcy would be subject to specific performance and adjudication by the bankruptcy court without a jury—a proposition completely at odds with both contract law and the jurisdictional limitations of the Supreme Court's *Marathon* decision, discussed in the jurisdictional section of this opinion.  *See Benz v. DTRIC Ins. Co. (In re Benz)*, 368 B.R. 861, 865, 868 n.5 (B.A.P. 9th Cir. 2007) (holding that an insurer does not violate the automatic stay by denying coverage under a policy, even if violates its obligations under the policy, unless "it files suit or performs another act specifically identified in section 362(a)").

**Conclusion**

For the reasons set out above, judgment will be entered, by separate order, in favor of the City of Los Angeles and Los Angeles World Airports on Counts II and V (automatic stay) and IV and VII (violation of § 525(a)).  As to remaining Counts I, III, and Vi (declaratory judgment and breach of contract), this opinion shall constitute this court's proposed findings of fact and conclusions of law, recommending entry of a permanent injunction in favor of United Air Lines, Inc.  In order to maintain the status quo pending consideration by the district court, a temporary injunction will be entered pursuant to 11 U.S.C. § 105(a).  *See Celotex Corp. v. Edwards*, 514 U.S. 300, 307-08 (1995) (upholding the jurisdiction of a bankruptcy court to enter an injunction under § 105(a) as to a matter related to a bankruptcy case).

Dated: May 31, 2008

Eugene R. Wedoff
United States Bankruptcy Judge